UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

FREDDY S. CAMPBELL,

      Plaintiff,

v.                               Civil Action No. 2:09-0503

UNITED STATES OF AMERICA,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is the United States' motion to dismiss the complaint and a cross-claim for lack of subject matter jurisdiction, filed June 23, 2010.

I.

      The United States' motion to dismiss is directed at the only remaining claim in this action, namely, plaintiff's cause of action under the Federal Tort Claims Act ("FTCA").[1]  The facts relevant to that remaining claim are set forth below.

      On June 19, 2005, plaintiff suffered an injury to his knee when he fell from the top bunk in his cell.  He was at the time a federal pretrial detainee in the custody of the United

---

[1]It is noted that the cross-claim of Carter County Detention Center and Randy Binion against the United States was dismissed on June 28, 2010.  It is thus ORDERED that the portion of the United States' motion seeking dismissal of the cross claim be, and it hereby is, denied as moot.

States Marshals Service ("USMS").  He was physically incarcerated, however, at the Carter County Detention Center ("Carter County") in Kentucky.  Carter County is a state jail facility under contract with the USMS to house federal pretrial detainees and those awaiting transfer to federal correctional institutions.  Plaintiff sustained further injury to his knee the following day during transport for a hearing.

On September 5, 2005, plaintiff's appointed criminal defense attorney sent a letter to Deputy United States Marshal John J. Perrine ("Deputy Perrine").  At the time Deputy Perrine was serving as the USMS Operations Supervisor for this district.  In that capacity, he was responsible for authorizing inmate transportation to outside medical facilities for nonemergency care.  The September 5, 2005, letter from defense counsel stated pertinently as follows:

> Although I am not a physician, I have had some knee issues so when Mr. Campbell showed me his knee, I saw that the capsule around the knee joint was tremendously swollen and contained a lot of moving fluid, probably blood trapped within the knee joint. He needs to have the knee aspirated, drawing off the fluid.  I believe that the risk of not doing this decreases his mobility but, even more importantly, increases the risk of stroke or pulmonary embolism due to a clot traveling through his body.  I think it is important that he gets medical treatment for this condition.

(Ltr. from Jacqueline A. Hallinan to John Perrine at 1 (Sept. 5, 2005)).

Following receipt of the letter, Deputy Perrine contacted Nurse Wilburn at Carter County.  She knew about plaintiff's injury and was monitoring it.  Deputy Perrine nevertheless asked that plaintiff be taken to the emergency room at King's Daughters Medical Center ("King's Daughters") in Ashland, Kentucky, for further evaluation.

On September 12, 2005, plaintiff was seen at King's Daughters by Dr. Bhawan Yamraj.  Dr. Yamraj apparently recommended that plaintiff have an MRI and orthopedic evaluation.  Deputy Perrine approved that course of action.  An MRI was scheduled for September 20, 2005, but was canceled due to plaintiff's plea hearing, which was scheduled for September 19, 2005.  The MRI was rescheduled for September 27, 2005.  Also scheduled was an October 11, 2005, consultation with Dr. David J. Jenkinson, a board-certified orthopedic surgeon in Kentucky.

After examining plaintiff on October 11, 2005, Dr. Jenkinson opined as follows:

> He hurt his knee approximately three and a half months ago, when he stumbled and fell and the knee gave way. He had immediate pain and swelling, but did not have any immediate medical attention.  He now presents over three months later with continued swelling with weakness and giving away in the left knee.  He has been unable to stand on his left leg without support.
>
>      . . . .

3

> [T]here is a grossly palpable defect in the
> intrapatellar region, consistent with patellar tendon
> rupture.  He has limited knee extension, with inability
> to maintain his knee in the extended position.  There
> is no medial or lateral ligament laxity.
>
> [An] MRI scan confirms high-riding patella, with
> complete patellar rupture.
>
> This man has a very serious injury to his knee.  He has
> a complete patellar tendon rupture, and this injury is
> now over three months old.
>
> The patient was advised that this is a serious problem
> which is difficult to repair.  <u>I believe he should go
> to a university center and I have recommended that he
> be referred to the University of Kentucky Sports
> Medicine Clinic.  He should have this appointment as
> soon as possible to get on with surgical treatment for
> this serious injury</u>.

(Dr. Jenkinson Clinic Note, Oct. 11, 2005 (emphasis added)).

During his deposition, Dr. Jenkinson observed that he "would not

attempt to" treat an injury of this type.  (Dep. of Dr. David

Jenkinson at 7, 9 ("I don't know how to do it.")).[2]  He went so

far as to have his staff attempt to make an appointment for

plaintiff at the University of Kentucky Sports Medicine Clinic,

---

[2]Dr. Jenkinson additionally testified as follows concerning
the unusual nature of the injury:

> [I]t's a difficult and unpredictable problem and I
> would see it rarely.
>
>     I mean, as far as a late onset one is concerned,
> I'm not sure in my 25 years I've seen more than maybe
> two or three, I can't recall.

(<u>Id.</u> at 10).

but the outcome of that process is unknown to the court.  The timing of the surgery appears to have been a significant concern to Dr. Jenkinson.  (Id. at 14 ("[T]he longer you leave it, the harder it is.")).

On October 17, 2005, Deputy Perrine sent via facsimile a copy of Dr. Jenkinson's Clinic Note to an entity listed on the cover sheet as "USMS Prisoner Medical."  The facsimile was directed to the attention of Lieutenant Commander Lori Hanton, a registered nurse whose title, listed on the facsimile, suggests that she is an officer in the United States Public Health Service ("USPHS").[3]

On October 26, 2005, Deputy Perrine sent the following email to Lieutenant Commander Hanton, with courtesy copies to the

---

[3]There appears to be a formal interagency relationship permitting the USMS to call upon the Public Health Service for guidance respecting the medical treatment of inmates.  United States Dep't of Justice, Office of the Inspector General, United States Marshal Service's Prisoner Medical Care 1 n.7 (2004), available at www.justice.gov/oig/reports/USMS/a0414/intro.htm ("The [USMA Office of Interagency Medical Services], in cooperation with the Public Health Service, provides advice to the district offices when a prisoner requires extensive medical treatment . . . ."); United States Dep't of Justice, United States Marshal Service, Fact Sheet 1 (2011), available at www.justice.gov/marshals/duties/factsheets/pod-1209.html ("[The] medical expertise [of the Public Health Service Commissioned Corps officers] has allowed them to provide invaluable assistance to districts dealing with prisoner health care issues and has contributed to the continued success of the program.").

Marshal for this district at the time and his Chief Deputy:

> I received your fax <u>approving surgical repair</u> of a
> patellar tendon rupture for inmate Freddy Campbell.
>
> Your note states that, "<u>Recommend arranging for surgery
> ASAP in a university center with sports medicine
> program</u>."
>
> It is not clear to me from your remarks, but are you
> inferring that I locate a hospital for this inmate to
> have his surgery?
>
> I expect that that is an area of expertise that should
> be handled at your level.

(Email from Dep. Perrine to Lieutenant Commander Hanton (Oct. 26, 2005) (emphasis added)).  Lieutenant Commander Hanton's response to Deputy Perrine, as quoted in his email above, suggests that she was deferring to Deputy Perrine respecting how to implement her approval of the surgical procedure.

After Deputy Perrine expressed his misgivings about that course of action, as reflected in his email message above, Lieutenant Commander Hanton appears to have offered further guidance in ascertaining how best to treat an inmate's medical needs, as reflected in an October 26, 2005, email message to Deputy Perrine:

> I do not know about the medical centers in your area.
> <u>If it can be done at the KY center, that would be fine</u>.
> Otherwise, your local jails should know where they send
> prisoners for orthopedic surgery <u>and which university
> hospitals are in the area</u>.  The doctor that evaluated
> him may know of other centers in your area as well.

(Email from Lieutenant Commander Hanton to Dep. Perrine (Oct. 26, 2005)).

Deputy Perrine asserts that, after consulting with the Marshal and the Chief Deputy, the Marshal decided to "locate an orthopedic surgeon in the local area." (Dep. Perrine Decl. at 5 ("From a manpower and security standpoint, surgery and rehabilitation could be better handled locally than in Kentucky.")). Deputy Perrine also noted that plaintiff's sentencing was scheduled for December 5, 2005, "which meant that Mr. Campbell needed to have the surgery and rehabilitation in advance of that date." (Id.)

At that point, on a date unstated, Deputy Perrine asserts that he "got out the phone book and started making calls." (Id.)  He mentioned specifically a call to Cabell Huntington Hospital and "speaking with someone who . . . [he] believe[d] was in the orthopedic surgery department." (Id. at 6).  He recalled the conversation as follows:

> I explained Mr. Campbell's situation and Dr.
> Jenkinson's recommendation.  The person I spoke with
> knew Dr. Jenkinson and advised me that it would be
> futile to send Mr. Campbell to Cabell Huntington
> Hospital because Dr. Jenkinson had already determined
> what needed to happen and where.

(Id.)

7

Deputy Perrine then decided to have plaintiff transferred from Carter County to South Central Regional Jail ("South Central") in Charleston, West Virginia, another contract jail facility. Deputy Perrine asserts that he intended to have the staff at South Central evaluate plaintiff's knee and assist Deputy Perrine in locating a surgeon. On November 16, 2005, plaintiff was transferred to South Central at Deputy Perrine's direction "in anticipation of evaluation and surgery in the Charleston area." (Id. at 6).

On November 28, 2005, Deputy Perrine contacted Sarah Carper, the Medical Director at South Central. He asked "her to locate a doctor and surgical facility in the Charleston area that could evaluate and schedule a procedure to repair" plaintiff's knee. (Id. at 7). On November 29, 2005, Ms. Carper advised Deputy Perrine that no orthopedic surgical facilities in the Charleston area would accommodate plaintiff "because of the prior recommendation that he be treated at a sports medicine facility such as the University of Kentucky." (Id.) He was further advised that a physician who evaluated plaintiff at South Central concurred with Dr. Jenkinson that plaintiff had "a serious injury to his left knee," adding that the "injury was not life threatening and that . . . [plaintiff] was ambulatory and stable." (Id.)

Plaintiff was transferred to Carter County in time for his December 5, 2005, sentencing in Huntington based upon the following conclusions reached by Deputy Perrine:

> Based on what I was advised by the medical providers at . . . [South Central] and in light of the pending sentencing date, I believed that the best course of action was to have Mr. Campbell transported to and monitored by . . . [Carter County] staff and allow the BOP to repair his knee after sentencing. I conferred with the United States Marshal and Chief Deputy who concurred.

(Id. at 8).

On December 5, 2005, plaintiff was sentenced. It was recommended that he be sent to a Bureau of Prisons ("BOP") medical facility. On December 7, 2005, the USMS requested an immediate designation to a BOP medical facility. On December 20, 2005, the BOP designated plaintiff to FCI Elkton in Ohio. Deputy Perrine asserts that plaintiff was delivered to BOP custody on January 12, 2006, with plaintiff asserting the transfer actually occurred on January 24, 2006. It appears, after piecing together various components of the record, that plaintiff remained untreated until October 6, 2006, when he was admitted to UK Good Samaritan Hospital in Lexington, Kentucky, for surgery by Dr. John Vaughn. (Def.'s Mot. in Lim. at 3; Dep. of Freddy S. Campbell; Dr. Jenkinson Dep. at 17).

In the closing paragraph of his declaration, Deputy Perrine observes as follows:

9

> I am not a trained health care provider. I rely upon
> the medical advice which I receive from the health care
> providers at the contract jail facilities and from
> trained medical personnel at the USMS headquarters like
> Lori Hanton to help advise me on the type of outside
> care needed for detainees such as Mr. Campbell. While
> Dr. Jenkinson referred to Mr. Campbell's knee injury as
> "serious" I was also advised that his condition was not
> life threatening and that he was ambulatory and stable.

(Id. at 9).

On May 7, 2009, plaintiff instituted this action.  The United States now moves to dismiss for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).  It asserts that "the decisions of the USMS as to where to have plaintiff's injured knee repaired were discretionary" and hence covered by the discretionary function exception to the FTCA.

## II.

### A.  Governing Standard

Federal district courts are courts of limited subject matter jurisdiction, possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute." United States v. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008).  As such, "there is no presumption that the

10

court has jurisdiction." <u>Pinkley, Inc. v. City of Frederick</u>, 191 F.3d 394, 399 (4th Cir. 1999) (citing <u>Lehigh Mining & Mfg. Co. v. Kelly</u>, 160 U.S. 327, 327 (1895)).  Indeed, when the existence of subject matter jurisdiction over a claim is challenged, "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." <u>Evans v. B.F. Perkins Co.</u>, 166 F.3d 642, 647 (4th Cir. 1999); <u>see</u> <u>also</u> <u>Richmond, Fredericksburg & Potomac R.R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991)). If subject matter jurisdiction is lacking, the claim must be dismissed.  <u>See</u> <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 506 (2006).

        Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal if the court lacks subject matter jurisdiction.  Our court of appeals has held that an FTCA claim should be dismissed pursuant to Rule 12(b)(1) "if the discretionary function exception applies to limit the waiver of sovereign immunity . . .." <u>Williams v. United States</u>, 50 F.3d 299, 304-05 (4th Cir. 1995).

        In such a case, the plaintiff bears the burden of persuasion, and the "'court may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding."

<u>Williams</u>, 50 F.3d at 304; <u>Kerns v. United States</u>, 585 F.3d 187, 192 (4th Cir. 2009) (quoting <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982)).  Neither party has requested an evidentiary hearing.  Additionally, plaintiff has not objected to the court considering the evidentiary materials submitted by the United States in support of its motion to dismiss.

The court, accordingly, will consider those submitted materials, albeit without the necessity of an evidentiary hearing.  <u>See</u> <u>Williams</u>, 50 F.3d at 304 ("In ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings.  Indeed, 'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'") (citing <u>Mortensen v. First Federal Sav. Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977)).

B.  Discretionary Function Exception

The FTCA creates a limited waiver of the United States' sovereign immunity by authorizing damage actions for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ."  28 U.S.C. § 1346(b)(1).  This waiver of sovereign immunity, however, is subject to several

exceptions, "[t]he most important of [which] is the discretionary function exception." <u>McMellon v. United States</u>, 387 F.3d 329, 335 (4th Cir. 2004) (en banc).

The discretionary function exception provides that the United States is not liable for "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The plaintiff bears the burden of proving that the exception does not apply. <u>Welch v. United States</u>, 409 F.3d 646, 651 (4th Cir. 2005); ; <u>Indemnity Ins. Co. of North America v. United States</u>, 569 F.3d 175, 180 (4th Cir. 2009).

While the exception is phrased in straightforward terms, its application has proven somewhat difficult. <u>Jamison v. Wiley</u>, 14 F.3d 222, 226 (4th Cir. 1994) ("The courts have struggled for years to define the scope of this so-called 'discretionary function' exception to the FTCA."). This is due in part to the fact that the exception raises separation-of-powers concerns, "mark[ing] the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from

13

exposure to suit [in federal court] by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984); Suter v. United States, 441 F.3d 306, 310 (4th Cir. 2006); see also McMellon v. United States, 387 F.3d 329, 341 (4th Cir. 2004) (noting "The Supreme Court has made clear that the discretionary function exception contained in the FTCA is grounded in separation-of-powers concerns.").  Congress enacted this exception to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort . . . [and] to protect the Government from liability that would seriously handicap efficient government operations."  McMellon, 387 F.3d at 341 (internal quotation marks omitted)(quoting Varig Airlines, 467 U.S. at 808)).

       To determine whether conduct by a federal agency or employee fits within the discretionary function exception, a two-prong test applies.  Medina v. United States, 259 F.3d 220, 226 (4th Cir. 2001); Estate of Bernaldes v. United States,  81 F.3d 428, 429 (4th Cir 1996).  The court must first decide whether the challenged conduct "involves an element of judgment or choice." Indemnity Ins., 569 F.3d at 180 (internal quotation marks omitted); North Carolina ex rel. Cooper v. Tennessee Valley

<u>Auth.</u>, 515 F.3d 344, 347 (4th Cir. 2008); <u>Suter</u>, 441 F.3d at 310
(citing <u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988)).
If the conduct does involve such discretionary judgment, then the
court must determine "whether that judgment is of the kind that
the discretionary function exception was designed to shield,"
that is, whether the challenged action is "based on
considerations of public policy." <u>Berkovitz</u>, 486 U.S. at 536-37;
<u>Suter</u>, 441 F.3d at 311.  This inquiry focuses "not on the agent's
subjective intent in exercising the discretion . . . , but on the
nature of the actions taken and on whether they are susceptible
to policy analysis." <u>United States v. Gaubert</u>, 499 U.S. 315, 325
(1991); <u>Indemnity Ins.</u>, 569 F.3d at 180.

        Thus, "a reviewing court in the usual case is to look
to the nature of the challenged decision in an objective, or
general sense, and ask whether that decision is one which we
would expect inherently to be grounded in considerations of
policy." <u>Baum v. United States</u>, 986 F.2d 716, 720-21 (4th Cir.
1993); <u>Indemnity Ins.</u>, 569 F.3d at 180.  As observed by our court
of appeals, "'Where there is room for policy judgment and
decision, there is discretion.'" <u>Smith v. Washington
Metropolitan Area Transit</u>, 290 F.3d 201, 208 (4th Cir. 2002)
(quoted authority omitted).  Moreover, when a statute,
regulation, or agency guideline permits a government agent to

15

exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324; Indemnity Ins., 569 F.3d at 180; Suter, 441 F.3d at 311; Medina, 259 F.3d at 228.

When the statutory or other guidance to the federal officer is phrased in terms of a recommendation, it is a matter of significance in determining if an element of judgment or choice is presented:

> Because the testing methodology for conducting a stability proof test on a pontoon-type small passenger vessel, such as the Fells Point Princess, was only recommended at the time the Coast Guard performed the stability proof test on the Fells Point Princess, logic dictates that the Coast Guard was permitted to use its discretion in how it conducted such test. Indeed, the Marine Safety Manual makes such discretionary authority clear by stating in a preceding portion of the manual that "the policies and guidance issued herein are intended as a guide for the consistent and uniform execution of the marine safety program, without undue restriction of independent judgment and action on the part of marine safety personnel."

Indemnity Ins., 569 F.3d at 180-81 (emphasis added). This is likewise the case in ascertaining if the second prong of the test is satisfied, namely, whether the decision is based upon considerations of public policy. Id. at 181 ("When, as here, established governmental policy, as expressed or implied by . . . agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are

grounded in policy when exercising that discretion.") (internal quotation marks omitted) (quoting Gaubert, 499 U.S. at 324).

Commenting further upon the contours of the exception, the court of appeals observed as follows in Williams:

> Because the Indian Health Care Improvement Act, which provides generally for the medical care of only Indians, permits, but does not mandate, the provision of emergency medical treatment to non-Indians, the decision of whether to provide such emergency medical treatment is at the hospital's discretion. The exercise of that discretion by the hospital and its personnel, even if it amounts to an abuse, falls within the discretionary-function exception because it affects a policy of the United States, i.e., the policy of providing health facilities for Indians in furtherance of the Indian Health Care Improvement Act. Decisions of this kind have routinely been found to fall within the discretionary-function exception of the FTCA.

Williams v. United States, 242 F.3d at 175.

Our court of appeals' precedent analyzing the second prong illustrates that the policy component is one of substance that will often apply once the first prong is established. See, e.g., Minns v. United States, 155 F.3d 445, 452 (4th Cir. 1998) (inoculation of military servicemen against potential biological and chemical attack); Baum v. United States, 986 F.2d 716, 723 n. 3, 724 (1993) ("design and construction" of guardrails over Baltimore-Washington Parkway); Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987) ("design and use" of guardrails and signs along Blue Ridge Parkway); Smith v. WMATA, 290 F.3d 201,

17

208-09 (4th Cir. 2002) (utilization of escalator during "emergency situation" at METRO station).

C.   Analysis

The first prong involves whether the challenged conduct is imbued with an element of judgment or choice.  The challenged conduct here is the USMS' choice respecting where and when to schedule the surgical repair.  Congress generally directed the USMS to "provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution."  18 U.S.C. § 4086.  At least one court has observed the open-ended nature of this statutory mandate.  Bethae v. United States, 465 F. Supp.2d 575, 582 (D.S.C. 2006) (noting that section 4086 directed "the safekeeping of prisoners but . . . [failed to] specify the method for such safekeeping.").

The governing regulations are similarly unstructured, requiring only that the USMS supervise the "[a]cquisition of adequate and suitable . . . health care and other services and materials required to support prisoners" in their custody.  28 C.F.R. § 0.111(o).  The governing statute and regulation thus mandate the provision of adequate and suitable health care to

18

inmates but with the necessary flexibility to account for a plethora of unforeseeable circumstances.

Turning to the instant case, within days of receiving Dr. Jenkinson's Clinic Note Deputy Perrine sought out the trained medical personnel at USMS headquarters.  After (1) receiving guidance from Lieutenant Commander Hanton concerning some available options for surgical repair, and (2) consulting with the Marshal and Deputy Marshal for this district, the decision was made to attempt to have plaintiff's knee repaired locally. It is undisputed that "manpower and security" considerations drove that decision.  There was also the perceived need to have plaintiff's surgery and rehabilitation completed by the time of his criminal sentencing, which was scheduled for December 5, 2005.  Under these circumstances, it seems clear that the USMS' treatment decisions were the product of judgment and choice.

Respecting the second prong, the discretionary function exception was designed to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort . . . ."  Suter v. United States, 441 F.3d 306, 310 (4th Cir. 2006) (internal quotation marks omitted) (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig

Airlines), 467 U.S. 797, 814 (1984)).  When a governmental

policy, as here, allows government agents to exercise discretion,

there is a presumption that the agents' acts are grounded in

policy.  Gaubert, 499 U.S. at 324.

        Plaintiff offers no argument substantial enough to

overcome the presumption.  It would be difficult to craft one.

In carrying out the aforementioned statutory mandate to assure

the safety and well-being of federal inmates, the USMS must take

account of a myriad of policy-based concerns.  First, the Marshal

in this district is responsible for a host of duties, including

judicial security, fugitive investigations, participation in

special tactical operations, witness security assistance, asset

forfeiture responsibilities, inmate and alien transportation, and

other inmate-related tasks that would include the provision of

medical care.  The USMS thus appropriately relied upon the

policy-based consideration of available "manpower" when

ascertaining how best to accomplish the treatment of plaintiff's

medical condition.

        Second, the "security" component of the decision is

also one rooted in policy.  The seriousness of plaintiff's

offense of conviction required the imposition of a mandatory

statutory minimum sentence.  The Judgment reflects that he

resided within Criminal History Category VI, the most serious

prescribed by the United States Sentencing Guidelines.  The
sentencing judge ultimately imposed a 140-month term of
incarceration.  Under these circumstances, the USMS had to
balance the appropriate treatment protocol with the significant
safety and security concerns presented by plaintiff.  It would
appear that the unsuccessful decision to have the surgical repair
performed in Charleston was based, at least in part, upon the
fact that it is the nerve center for the USMS in this district
and in reasonable proximity to Huntington, the point of holding
court where sentence would be imposed.  It is thus evident that,
in addition to involving an element of judgment or choice, the
decisions relating to plaintiff's treatment were also grounded in
policy considerations.

        Plaintiff quarrels with that conclusion.  He appears to
assert that once Dr. Jenkinson concluded surgery should occur in
Kentucky as soon as possible, the die was cast and the USMS was
bound to move swiftly to that end.  This contention, along with
his other fault-based contentions, are not material.  If the
negligent exercise of discretion was all that was required to
overcome the FTCA statutory exception, the carve out would
evaporate in most cases.  The governing statute and case law
foreclose the argument in any event.  See 28 U.S.C. § 2680(a)
(providing a complete defense to FTCA liability when there is

involved "the exercise or performance or the failure to exercise
or perform a discretionary function or duty on the part of a
federal agency or an employee of the Government, whether or not
the discretion involved be abused"); <u>Medina</u>, 259 F.3d at 228
("Even if the INS abused its discretion . . . Medina would not be
able to present an FTCA claim.  Section 2680(a) specifically
provides that the discretionary function exception exists
'whether or not the discretion involved be abused.'"); <u>Fothergill
v. United States</u>,  566 F.3d 248, 254 (1st Cir. 2009) ("Once . . .
[the discretionary function exception has been deemed to apply],
the prophylaxis of the exception attaches regardless of whether
the decision maker acted negligently or manifestly abused the
granted discretion.").

          It is regrettable that plaintiff did not receive
surgical intervention at some point between mid-October 2005 when
Dr. Jenkinson issued his report and December 7, 2005, when the
USMS sought an expedited designation for plaintiff.  When one
considers the entire time line of 15 1/2 months from injury to
surgery, however, spanning from June 20, 2005, to October 6,
2006, the USMS had a comparatively brief period within which to
assess and address plaintiff's condition.  Despite that fact, the
USMS undertook a number of actions between first learning of the
injury in early September 2005 and sentencing on December 5,

2005, that were designed to seek appropriate treatment for this difficult and infrequently appearing injury, while at the same time accommodating important manpower, security, and case disposition concerns.  Of utmost importance, at the time when Deputy Perrine first learned of plaintiff's injury in September, precious months had already passed without action by the state custodians that might have initiated a better outcome.[4]

As noted, however, those fault-based observations play no role in the section 2680(a) calculus.  The court concludes plaintiff has not discharged his burden to demonstrate the inapplicability of the discretionary function exception.  The United States is consequently entitled to dismissal.

---

[4]It is also observed that the Bureau of Prisons, which held custody of plaintiff for some nine months from January until his surgery in October, 2006, is, of course, not a named party to this action.

III.


Based upon the foregoing, it is, accordingly, ORDERED as follows:

1.    That the United States' motion to dismiss be, and it hereby is, granted; and

2.    That this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED:  January 31, 2011

John T. Copenhaver, Jr.
United States District Judge

24